RAMÓN MORÁN SIMÓ, demandante y recurrido, *v.* FLOR GRACIA CRISTÓBAL, demandado y recurrente.

*Número:* R-72-152        *Resuelto:* 14 de septiembre de 1977

Rafael A. Escudero Bonilla, Dennis Martínez Irizarry y Celestino Matta Méndez, abogados del recurrente; José M. Biaggi Junquera y Ramón Morán Loubriel, abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Este caso comenzó en el 1968 con una acción de desahucio que se convirtió luego en una acción civil ordinaria al impugnar el recurrente Flor Gracia Cristóbal el título del recurrido Ramón Morán Simó sobre el inmueble en controversia, alegando que la causa aducida en la escritura de venta otorgada entre ellos era simulada por constituir el verdadero propósito del traspaso el garantizar la deuda que Flor Gracia tenía con Morán. Luego de un prolongado·trámite el tribunal de instancia limitó la controversia a determinar si la venta y el contrato de arrendamiento subsiguiente entre las partes eran auténticos o simulados. Finalmente, al no darle crédito al testimonio del recurrente Flor Gracia, dictó sentencia declarando con lugar la demanda de desahucio y, en consecuencia, declaró válido tanto el contrato de compraventa mediante el cual Gracia traspasó la propiedad a Morán como el contrato subsiguiente de arrendamiento entre ambos.

En un extenso y elaborado alegato Gracia Cristóbal impugna las conclusiones de hecho del tribunal de instancia atacando la apreciación de la prueba efectuada por el tribunal de instancia.

La prueba sobre los hechos pertinentes a la alegada simulación consistió únicamente del testimonio del recurrente, de su testigo Juan Ferrá Morell y del recurrido Morán Simó. Los hechos esenciales no están en disputa pero las partes derivan de los mismos diversos efectos y consecuencias, especialmente con respecto al verdadero propósito del traspaso de la finca.

Por largos años Morán y Antonio Gracia Rosario, causante del recurrente, mantuvieron buenas relaciones de amistad y de negocios. Morán refaccionaba a Gracia Rosario quien cultivaba café y tabaco en la finca objeto del pleito. Al morir Gracia Rosario en febrero de 1959 su deuda refaccionaria con Morán ascendió a $26,000 y el caudal relicto a su óbito estaba compuesto de la finca aquí en cuestión, otras dos fincas y una casa en Barrio Obrero.

La sucesión de Gracia Rosario la componían el recurrente y sus cinco hermanos. En mayo de 1959 la sucesión garantizó parte de la deuda con un pagaré al portador por la cantidad de $15,000. Dicho pagaré tenía la garantía de una hipoteca voluntaria constituida sobre la finca del pleito. El recurrente señala en su alegato que no hay prueba sobre las circunstancias en que se otorgó la hipoteca. Pero lo cierto es que él admite que la misma se otorgó para garantizar el pagaré al portador, que estaba en poder de Morán.

El recurrente Gracia Cristóbal fue adquiriendo la participación de sus hermanos en la finca pagándole a la mayor parte de ellos con fondos adelantados por Morán y que le eran cargados a su cuenta de refacción que tenía con éste.

Finalmente, en mayo de 1961, se otorgó la escritura de compraventa mediante la cual la sucesión vendió la finca a Morán por la cantidad de $19,000, de los cuales Morán acreditó a la cuenta de la sucesión la suma de $13,035, quedando así liquidada, y, además, acreditó a la cuenta del recurrente la suma de $5,966.44. En la escritura de compraventa se hizo figurar la venta por la cantidad de $4,000 pero tanto de los

libros de Morán como del informe del propio perito del recurrente, y del testimonio de dicho perito, Rafael Caamaño Pabón, surge que el precio de venta fue de $19,000. No hay explicación en la prueba de por qué aparece en dicha escritura la sucesión traspasando la propiedad a Morán cuando ya el recurrente Gracia Cristóbal había comprado las participaciones de sus hermanos, y, en consecuencia, era el único dueño de la propiedad. [1]

El recurrente continuó cultivando la finca después de la venta y en julio de 1962 él y Morán otorgaron un contrato de arrendamiento por el término de cinco años y un canon anual de $800.00. Poco antes de vencerse el arrendamiento, el recurrente dejó de cultivar la finca y se fue a trabajar con la Autoridad de Carreteras. No obstante, continuó ocupando la vivienda y otras estructuras, razón por la cual Morán instó la acción de desahucio.

La contención del recurrente en el juicio y en su recurso de revisión es que tanto la escritura de venta a Morán como el contrato de arrendamiento entre ambos son simulados. El tribunal resolvió la controversia dirimiendo los conflictos y adjudicando la credibilidad en forma adversa a la contención del recurrente.

Hemos examinado la voluminosa prueba documental y oral presentada en el juicio. Es cierto que la prueba del recurrido Morán incurrió en inconsistencias y contradicciones. Pero no es menos cierto que la prueba del recurrente adolece también de contradicciones e inconsistencias, que con toda probabilidad indujeron al tribunal de instancia a no darle crédito al testimonio del recurrente. Basta anotar las siguientes para ilustrar el punto:

---

[1] Relacionado con este aspecto está el hecho de que en la contestación a la demanda de Gracia Cristóbal alega que la finca pertenecía a la sucesión, hecho que posteriormente modifica en la conferencia con antelación al juicio, para alegar título exclusivo al inmueble.

1. La alegación original del recurrente en la contestación a la demanda es que la propiedad pertenecía a la sucesión, a pesar de que él había adquirido la participación de sus hermanos y, por tanto, él era el único dueño del inmueble. La alegación se enmendó en la conferencia con antelación al juicio para conformarla a la prueba documental.

2. El recurrente alega que el precio de venta a Morán es inadecuado, sin embargo, adquirió la participación de sus hermanos a base del mismo precio, sin que lo considerara entonces inadecuado.

3. El recurrente pide en su contestación a la demanda que se abone a la deuda los cánones de arrendamiento pagados por él a Morán, a sabiendas de que no pagó un solo canon.

4. En el examen directo afirmó que el balance de la deuda a la muerte del causante era de $26,000. No obstante en el contrainterrogatorio dijo no recordar la cantidad contestando la pregunta con evasivas.

5. La explicación de cómo y por qué vendió la finca a Morán es tan confusa, que su mismo abogado se vio obligado a decirle que no lo había entendido.(2)

_____

(2) En 1 T. E. pág. 13, el recurrente da la siguiente explicación a preguntas de su abogado:

"P. ¿Tiene la bondad de explicar qué ocurrió, si algo, con respecto a la finca objeto del pleito?

"R. De este pleito, que el señor Morán me llamó a mí, cuando mis dos hermanos que no habían cogido su herencia, me llamó, que necesitaba un dinero yo, entonces, yo fui donde él que era la casa que yo llevaba refacción y le expliqué, y él entonces, como yo no podía comprar directamente, porque como era él quien me refaccionaba, tenía que coger a través de una segunda persona, el señor Morán me dijo que hiciera la escritura a nombre de él y después arreglábamos, cuando la escritura estuviera y se registrara y que me hiciera un contrato de arrendamiento garantizando que yo tendría la propiedad hasta tanto se inscribiera la escritura."

En la pág. 18 *Id.* su abogado le preguntó de nuevo porque no había entendido claramente la explicación:

"Lcdo. Escudero:

"Testigo, hace un momento, cuando usted explicaba las razones que le dio don Ramón para que usted hiciera ese traspaso de la propiedad, no entendimos claramente qué razones le dio él para que usted llevara a cabo ese otorgamiento a favor de él.

"R. Para garantizar lo que debíamos."

6. En el contrainterrogatorio negó que hubiese firmado el pagaré al portador de $15,000 para verse obligado a reconocer su propia firma al mostrársele el documento. (1 T.E. págs. 56–57)

7. Atestó que el canon de arrendamiento de $800.00 era solo para abonar a la deuda existente, lo cual hubiera tomado cerca de 30 años para liquidarla.

8. Su explicación de que se puso la finca a nombre de Morán porque él no sabía que podía adquirirla directamente de sus hermanos es de dudosa validez pues la prueba demuestra que él había adquirido directamente la participación de varios de sus hermanos.

9. Su afirmación de que cuando visitó a Morán acompañado de Ferrá llevaban $13,000 en efectivo quedó controvertida por la propia declaración de Ferrá quien atestó que le tomó cerca de dos meses conseguir esa cantidad. (2 T.E. pág. 14)

10. Atestó que hizo varias gestiones para la venta de la finca con diversas personas que estaban dispuestas a comprarla pero no presentó a ninguno de ellos como testigos.

En cuanto a Morán estamos de acuerdo que su conducta no se ajusta a la de un hombre de negocios. Se presta a suspicacia el que haya adquirido la finca, y sin embargo, pagara las contribuciones sobre la propiedad a nombre de Flor haciéndole el cargo correspondiente a la cuenta de éste.[3] También es significativo que no cobrara los cánones de arrendamiento ni que tampoco los cargara al recurrente en su cuenta refaccionaria, dizque porque él sabía que el recurrente no tenía recursos para pagarlos y si los cargaba a la cuenta aparecería como un ingreso a los fines de la contribución sobre ingresos. No es convincente tal explicación.

El récord escrito nos deja dudas tanto de la prueba de Flor Gracia como la de Morán. En ambas encontramos serios interrogantes que dejan nuestro ánimo insatisfecho de cualquiera que hubiese sido el resultado. El tribunal de instancia, sin embargo, dirimió los conflictos de la prueba y apreció el

---

[3] Aparece de la prueba documental que en el año 1965 el recurrente pagó las contribuciones directamente.

valor probatorio de los testimonios que desfilaron ante sí. Las dudas que pudiéramos tener sobre los hechos fueron debidamente resueltas y el récord no justifica que intervengamos con la discreción así ejercitada.

■ Por otro lado, Morán tiene un título a su favor que la ley presume válido, por lo que, al impugnarlo, incumbe al recurrente el peso de probar lo contrario. Art. 464 Código de Enjuiciamiento Civil, Ley de Evidencia, 32 L.P.R.A. sec. 1887 (19). Pero ya vimos que no pudo preponderar en su contención al negársele crédito a su testimonio.

■ Quizá, sea éste el caso en que cobra mayor virtualidad la regla de inhibición al efecto de que este Tribunal no dejará sin efecto una sentencia cuyas conclusiones encuentren apoyo en la prueba desfilada, excepto cuando se demuestre pasión, prejuicio y parcialidad. Ello debe ser así aunque no estuviéramos del todo de acuerdo con algunas de las conclusiones de hecho y aun cuando de haber sido nuestra la facultad de adjudicar los hechos en primera instancia hubiésemos podido llegar a un resultado distinto. De otra manera, estaríamos usurpando las funciones de adjudicación del tribunal de instancia y desnaturalizando el propósito y alcance de la revisión judicial.

No es necesario discutir el error relacionado con la interpretación del Art. 1410 del Código Civil, 31 L.P.R.A. sec. 3915, porque no se trata en este caso de una venta con pacto de retro, la cual en ciertas situaciones se presume que constituye un préstamo con garantía hipotecaria. La escritura de traspaso en el caso de autos sólo reconoce a Gracia Cristóbal un derecho de prelación para en caso que Morán vendiera la finca él pudiera adquirirla preferentemente en igualdad de precios y condiciones. La jurisprudencia que cita el recurrente en su alegato no es pues de aplicación al caso de autos.

*Se dictará sentencia confirmando la aquí recurrida.*

El Juez Asociado Señor Dávila se inhibe. El Juez Asociado Señor Rigau no intervino.